**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| **VIRNETX INC.,** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| **vs.** § | **CASE NO. 6:10-CV-417** |
| § | |
| **APPLE INC.,** § | |
| § | |
| **Defendant.** § | |
| § | |

**MEMORANDUM OPINION AND ORDER**

The following motions are before the Court:

- Apple's Motion for Judgment as a Matter of Law under Rule 50(b) or, in the alternative, for a New Trial or a Remittitur (Docket No. 623);

- VirnetX's Motion for Post-Verdict Damages to the Time of Judgment, Pre-Judgment Interest, and Post-Judgment Interest (Docket No. 620);

- VirnetX's Amended Motion for Post-Verdict Damages (Docket No. 657);

- VirnetX's Motion for a Permanent Injunction (Docket No. 621); and

- VirnetX's Motion for Entry of Judgment on the Jury Verdict, Request for Attorneys' Fees, and Judgment against Apple on Apple's Late-Abandoned Counterclaims and Defenses, including all of Apple's Alleged Prior Art References (Docket No. 625).

For the reasons stated below, Apple's Motion for Judgment as a Matter of Law under Rule 50(b) or, in the alternative, for a New Trial or a Remittitur is **DENIED**.  VirnetX's Motion for Post-Verdict Damages to the Time of Judgment, Pre-Judgment interest, and Post-Judgment Interest is **GRANTED IN PART** and **DENIED IN PART**.  VirnetX's Amended Motion for Post-Verdict Damages is **GRANTED.**  VirnetX's Motion for Permanent Injunction is **DENIED**, and

**SEVERS** VirnetX's request for an Ongoing Royalty into a separate action.  Lastly, VirnetX's Motion for Entry of Judgment on the Jury Verdict, Request for Attorneys' Fees, and Judgment against Apple on Apple's Late-Abandoned Counterclaims and Defenses, including all of Apple's Alleged Prior Art References is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

On August 11, 2010, VirnetX, Inc. ("VirnetX") filed this action against Apple, Inc. ("Apple") alleging that Apple infringed U.S. Patent Nos. 6,502, 135 ("the '135 Patent"), 7,418, 504 ("the '504 Patent), 7,490,151 ("the '151 Patent), and 7,921,211 ("the '211 Patent)(collectively, "the patents-in-suit").  The '135 and '151 Patents generally describe a method of transparently creating a virtual private network ("VPN") between a client computer and a target computer, while the '504 and '211 Patents disclose a secure domain name service.

VirnetX accuses Apple's VPN On Demand and FaceTime features of infringement.  Both products feature establishing secure communications, with Apple's FaceTime feature providing a secure communication link for users when video-chatting.  Apple's VPN On Demand feature on the other hand is a product that seamlessly creates a VPN when a user requests access to a secure website or server.

A jury trial regarding the instant suit commenced on October 31, 2012.  At trial, VirnetX contended that Apple infringed claims 1, 3, 7, 8 of the '135 Patent; claims 1 and 13 of the '151 Patent; claims 1, 2, 5, 16, 21, and 27 of the '504 Patent; and claims 36, 37, 47 and 51 of the '211 Patent.  In response, Apple asserted its FaceTime and VPN On Demand features did not infringe the patents-in-suit and that the asserted claims were invalid.  Following a five-day trial, the jury returned a verdict that the '135, '151, '211, and '504 Patents were not invalid and Apple infringed the asserted claims.  To compensate VirnetX for Apple's infringement, the jury awarded VirnetX $368,160,000 in damages.

**APPLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE
ALTERNATIVE, FOR A NEW TRIAL OR A REMITTITUR**

*Judgment as a Matter of Law, New Trial, and Remittitur Standards*

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(A). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 700. The jury's verdict must  also be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). The moving party is entitled to judgment as a matter of law, "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005).

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in

an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).

Remittitur is within the sound discretion of the trial court and is only appropriate when the damages verdict is "clearly excessive." *See Alameda Films S.A. v. Authors Rights Restoration Corp.*, 331 F.3d 472, 482 (5th Cir. 2003).

**Judgment as a Matter of Law Regarding Direct Infringement**

Apple first contends that VirnetX failed to present substantial evidence that Apple's VPN On Demand and FaceTime features infringe the patents-in-suit. *See* Docket No. 623 at 2–16.

*Applicable Law*

To prove infringement, the plaintiff must show the presence of every element or its equivalent in the accused device. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). Determining infringement is a two-step process: "[f]irst, the claim must be properly construed, to determine the scope and meaning. Second, the claim, as properly construed must be compared to the accused device or process." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

*VPN On Demand*

The parties' primary dispute at trial was if in fact Apple's VPN On Demand feature "determines whether" a DNS request is requesting access to a secure website or server (the "determining whether" limitation/step). At trial, VirnetX alleged the VPN On Demand feature

infringed claims 1, 3, 7, 8 of the '135 Patent, and claims 1 and 13 of the '151 Patent.  The '135

Patent discloses a method of transparently creating a virtual private network ("VPN") between

client computer and a target computer, while the '151 Patent describes creating a secure

communication link based on a domain name service ("DNS") request.

Claim 1 of the '135 Patent is a representative claim and claims the following:

A method of transparently creating a virtual private network (VPN) between a
client computer and a target computer, comprising the steps of:

(1) generating from the client computer a Domain Name Service (DNS)
request that requests an IP address corresponding to a domain name
associated with the target computer;
(2) determining whether the DNS request transmitted in step (1) is requesting
access to a secure web site; and
(3) in response to determining that the DNS request in step (2) is requesting
access to a secure target web site, automatically initiating the VPN
between the client computer and the target computer.

While the Court has not construed the word "determining," in its claim construction

opinion, the Court noted this determining step could be performed by the client computer or by

the target computer.  *See* Docket No. 266 at 18–20.  Additionally, the Court has construed the

phrase "secure web site" to mean "a website that requires authorization for access and that can

communicate in a VPN."  Docket No. 266 at 21.[1]

Apple now contends that VirnetX failed to present substantial evidence that the VPN On

Demand feature meets the "determining whether" limitation.  Docket No. 623 at 3.  Apple argues

that the feature cannot meet this limitation, because the accused feature cannot determine

whether the DNS request actually corresponds to a secure website or to a secure server, as

Apple's expert, Dr. Kelly, demonstrated.  *Id.*; *see* 11/02/12 a.m. TT at 148:10–21; 154:5–156:18;

167:8–176:25.

---

[1] The '151 Patent is directed to creating connections with a secure server.  Like "secure website," the Court
construed secure server to mean "a server that requires authorization for access and that can communicate in an
encrypted channel."  Docket No. 266 at 24.

Apple explains that the VPN On Demand feature operates by referencing a "configuration file," which is created by the user.  *Id.*  Prior to using the feature, a user will create a list of websites or servers in the "configuration file," which the user wishes to establish a secure connection with in the future.  *Id.* at 3. If a particular website is listed in the "configuration file," when a user later requests that particular website, the VPN On Demand feature will first compare the requested website to those websites listed in "configuration file." If the website is listed in the "configuration file," the feature will then automatically create a VPN. *Id.*  However, a user may erroneously enter public websites, i.e. non-secure websites, such as www.ebay.com, in the "configuration file."  If a user then requests this public website, the feature will automatically create a VPN, even though the website is not a secure website.  *Id.* Therefore according to Apple, the VPN On Demand feature does not meet the claim limitation, because the feature does not actually determine whether a website or server is secure.  *Id.* Instead, the feature merely compares the requested website to the "configuration file."  Apple further illustrates the feature's inability to perform the claim step, explaining when a user requests a secure website that is not listed in the "configuration file," a VPN will not be created even though the user has requested a secure website. *Id.* at 4.

Apple concedes VirnetX did present testimony and evidence that Apple's accused VPN On Demand feature can be configured to infringe the '131 and '151 Patents.  *See* 11/01/12 a.m. TT at 48:18–52:15; 56:5–61:9.   However, Apple contends VirnetX's expert Dr. Jones's interpretation of the "determining whether" step is unsupported by the claim language.  *Id.*  At trial, Dr. Jones stated the feature performs the "determining whether" step when the requested website or server is compared to the configuration file.  11/01/12 a.m. TT at 31:19–32:12; 48:18–52:15; 11/01/12 p.m. TT at 18:1–19:20.  However, Apple argues that "the claims require that the

actual *security* of the requested web site or server be 'determined,'" which does not occur when the requested website or server is compared to the configuration file. *Id.* at 4–5. Apple argues that to be found infringing, the accused VPN On Demand feature must be able to decide if a DNS request corresponds to a secure server or website, but the accused feature lacks this capability. Rather, the feature only initiates VPN connections with whatever server or website the user has provided. *Id.* at 5. Even Dr. Jones acknowledged that the VPN On Demand feature can initiate VPN connections with unsecure websites. *See* 11/01/12 p.m. TT at 21:8–25:7. Since the feature cannot actually determine a requested website or server's security, then Apple argues no reasonable factfinder could have found Apple or its customers infringed the asserted claims of the '151 or the '135 Patent.

However, Dr. Jones presented a thorough infringement analysis of how Apple's VPN On Demand feature can be configured to infringe the '131 and the '151 Patents based on Apple's internal documents and Apple's source code. Dr. Jones explained that the "determining whether" step can be performed by comparing the requested domain name against a list of domain names, i.e. the "configuration file." 11/01/12 a.m. TT at 48:18–52:15. While Dr. Jones acknowledges the feature may initiate VPN connections with unsecure websites, the feature is not intended to be used in this manner. 11/01/12 a.m TT at 26:8–18. In rejecting Apple's alternative, Dr. Jones stated Apple's interpretation would impermissibly add another limitation to the claims, because the claim language does not require verifying the identity of the secure website or server. 11/01/12 p.m. TT at 33:15–35:3.

There is no requirement in the claims, as Apple suggests, that the security of the requested website or server be verified. Instead, the claims merely require that the feature ascertain whether a VPN is needed. *See* '135 Patent col. 47:27–28. Even Apple agrees that if a

user correctly enters a secure website into the "configuration file," the VPN On Demand feature will create a VPN when that website is accessed.   *See* 11/02/12 a.m. TT at 153:22–154:4; 11/02/12 p.m. TT at 105:9–12.   Simply because a user may enter unsecure websites or servers into the "configuration file" does not defeat infringement.   At best, it could have a de minimis effect on damages.   Ultimately, Apple is rearguing the infringement theory it presented at trial, which the jury was free to reject.   Here, VirnetX produced substantial evidence that the VPN On Demand feature meets the "determining whether" limitation.

Additionally, Apple contends that VirnetX failed to demonstrate that Apple's VPN On Demand feature meets other claim limitations found in either the '135 or '151 Patent.   Docket No. 623 at 6–11. Specifically, Apple argues: (1) VirnetX failed to show that the feature returns an IP address for a requested domain name to the requester; (2) failed to show the feature creates a secure and anonymous communication between computers; (3) failed to demonstrate the feature transmits a DNS request from the client computer; and (4) failed to demonstrate that the feature creates an encrypted or secure channel between the client and the secure server.   *Id.* at 6, 8–11.

Regarding the encrypted or secure channel limitation, Apple alleges VirnetX's infringement theory is inherently flawed.   Docket No. 623 at 10.   VirnetX conceded the VPN On Demand feature did not literally meet the   "encrypted channel" limitation, however VirnetX argued the feature infringed under the Doctrine of Equivalents ("DOE").   11/01/12 a.m. TT at 74:6–76:1.   Apple argues VirnetX's doctrine of equivalents argument — a system in which the encrypted channel only extends from the device to the VPN server and not to the target server — is flawed, because the proposed equivalent would effectively vitiate the limitation.   *Id.*   Apple also asserts that the proposed equivalent fails to meet the function-way-result test, because it fails

to provide the security one would receive with end to end encryption, as required by the claims. *Id.* at 11.

In response, VirnetX contends Apple's interpretation of the doctrine of equivalents would require VirnetX to prove actual infringement, even though the doctrine clearly does not require such a showing.  Docket No. 632 at 10.  Also, VirnetX argues Apple's argument regarding a "secure channel" is misplaced, as VirnetX did produce evidence that the limitation was literally practiced by the feature.  See 11/01/12 a.m TT at 82:2–23.

To support a finding of infringement under the DOE, a patentee must either: (1) demonstrate an insubstantial difference between the claimed invention and the accused product or method; or (2) satisfy the function, way, result test.  *Aquatex Industries, Inc. v. Techniche Solutions*, 479 F.3d 1320, 1326 (Fed. Cir. 2007) (citing *Graver Tank & Mfg. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)).  A patentee must provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device or process on a limitation-by-limitation basis.  *Id.* at 1328 (quoting *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)).  A patentee should typically provide particularized testimony from a qualified expert describing the claim limitations and establishing that those skilled in the art would recognize the equivalents.  *Id.* at 1329.  However, the expert is not required to "re-start his testimony at square one when transitioning to a doctrine of equivalents analysis."  *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007).  Instead, an expert may explicitly or implicitly incorporate his earlier testimony into the DOE analysis.  *Id.*

Here, VirnetX provided evidence that the VPN On Demand feature does create an "encrypted channel" as required by claims 1 and 13 of the '151 Patent.  *See* 11/01/12 a.m. TT at

74:23–79:10 (Dr. Jones explaining that the creation of an encrypted channel only between the client and VPN server, and not the client and the secure server, meets the claim limitation under DOE).   Additionally, VirnetX produced evidence that the feature literally meets the "secure channel" limitation.   11/01/12 a.m. TT at 82:2–23.   Accordingly, VirnetX did present substantial evidence to support the jury verdict that the VPN On Demand feature meets the "encrypted channel" and "secure channel" claim limitations.

As to Apple's other arguments, VirnetX did produce substantial evidence showing the Apple's VPN On Demand feature meets the claim limitations disputed by Apple.   For example, Dr. Jones explained that the feature returns an IP address for a requested domain name to the requester, when it returns an IP address to the Safari application after a domain was requested.   *See* 11/01/12 a.m. TT at 63:13–64:4.   He also detailed how a secure and anonymous communication between computers is established by the feature.   11/01/12 a.m. TT at 34:17–37:12; 54:18–55:23.   Additionally, Dr. Jones demonstrated how the feature meets the transmitting requirement when the DNS request is sent from the Safari web browser and sent to the iOS operating system.   11/01/12 a.m. TT at 47:22–48:12.   Accordingly, VirnetX produced substantial evidence to demonstrate Apple's VPN On Demand meets all the claim limitations of the asserted claims of the '135 Patent and '151 Patent.

Finally, Apple alleges VirnetX failed to demonstrate that Apple directly infringes any asserted method claim of the '135 Patent.[2]   Docket No. 623 at 6–7.   Apple argues VirnetX

---

[2] Independent claim 1 and dependent claims 3, 7, and 8 of the '135 Patent were asserted against Apple.  Claim 1 is directed to "[a] method of transparently creating a virtual private network (VPN) between a client computer and a target computer, comprising the steps of: (1) generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer; (2) determining whether the DNS request transmitted in step (1) is requesting access to a secure web site; and (3) in response to determining that the DNS request in step (2) is requesting access to a secure target web site, automatically initiating the VPN between the client computer and the target computer."

presented no evidence that Apple itself preformed all the steps of any asserted claim, and it is improper for VirnetX to assume Apple conducted internal testing of the method while the feature was being developed to show direct infringement. *Id.* at 7; *see Mirror World, LLC v. Apple, Inc.*, 784 F. Supp. 2d. 703, 713 (E.D. Tex. 2011).

"To infringe a method claim, a person must have practiced all steps of the claimed method." *Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197, 1206 (Fed. Cir. 2010). "[A] method claim is not directly infringed by the sale of an apparatus even though it is capable of performing only the patented method. The sale of the apparatus is not a sale of the method. A method claim is directly infringed only by one practicing the patented method." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774–75 (Fed. Cir. 1993); *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1335 (Fed. Cir. 2008) ("[A] party that sells or offers to sell software containing instructions to perform a patented method does not infringe the patent under § 271(a).").

Here, VirnetX did address direct infringement of the '135 Patent, stating Apple performed its own internal testing and use.  11/01/12 a.m. TT at 88:12–89:11 (Dr. Jones stated, "they directly infringe by performing – Apple does that by performing the steps itself, say, through its own internal use and testing.").  VirnetX also introduced evidence that once the feature is set-up by the user, the actual steps of the asserted claims are performed by the feature itself and not the user. *See id.;* 11/01/12 a.m. TT at 34:5–20. While Apple contends user input is required to practice the claimed invention, the steps of the asserted claims do not explicitly require an additional party's involvement. *See SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1331 (Fed. Cir. 2010)(finding direct infringement when the accused products automatically perform all the steps in the asserted claims).  For example, claim 1 of the '135 Patent only has three steps: generating a DNS request; determining whether that DNS request is requesting access to a secure

website; and automatically initiating a VPN if the DNS request corresponds to a secure website. Col. 47:21–33.  Nothing in the claim language requires a user to set up a configuration file or take other steps for the VPN On Demand feature to infringe.  Instead, once a website is entered in a browser, the accused feature will perform the steps of the asserted claims.  In light of Dr. Jones' testimony and the claim language, VirnetX provided substantial evidence to establish Apple directly infringed the method claims of the '135 Patent.

*FaceTime*

As to the FaceTime feature, the parties' arguments at trial mostly concerned whether the feature meets the "direct communication" limitation.   At trial, VirnetX alleged Apple's FaceTime feature infringed claims 1, 2, 5, 16, 21, 27 of the '504 Patent and claims 36, 37, 47, and 51 of the '211 Patent.  Each claim requires some indication that "the domain name service system supports establishing a secure communication link."  *See* '211 Patent, claim 36; '504 Patent, claim 1.  In its claim construction opinion, the Court construed "secure communication link" to mean "a direct communication link that provides data security."  Docket No. 266 at 13.

Both parties agree that "secure communication" requires a direct communication, however the parties dispute whether a network address translator (NAT) allows for direct communication.   *See* 11/01/12 p.m. TT at 50:19–51:15.  Both sides acknowledge that the FaceTime feature can operate either via a relay server or via a NAT or other devices containing a NAT functionality.  *See* 11/01/12 p.m. TT at 51:24–52:24.  VirnetX concedes that the feature does not infringe if calls are routed through a relay server, because there is no direct communication through a relay server. 11/01/12 p.m. TT at 52:19–24.  The only dispute is whether a NAT impedes direct communication between the devices.

Apple devices, such as iPhones, can be located behind other devices that have a NAT functionality.  NATS alter or readdress the IP address of data packets sent between devices.

Apple argues this readdressing of data packets interrupts any direct communication between the two Apple devices.  Docket No. 623 at 11–13.

VirnetX's expert, Dr. Jones, agreed that "secure communication link" requires a direct communication.  11/01/12 p.m. TT at 50:19–22.  However, Dr. Jones explained in his testimony that NATs do not impede direct communication.  11/01/12 a.m. TT at 116:22–117:5; 119:8–23. Dr. Jones distinguished a relay server, which VirnetX conceded did not infringe, from a NAT router, which VirnetX argued does infringe.  Dr. Jones explained that the relay server creates two separate communications, while a NAT router still allows for "end-to-end communication between the two devices" because it merely translates addresses. 11/01/12 a.m. TT at 116:1– 117:5.  VirnetX also submitted evidence that describes how the FaceTime feature establishes peer-to-peer connections.  *See* PX 213; PX 215; PX 472; PX 485; and PX 478; 11/01/12 a.m. TT at 119:24–123:1.

Additionally, the Court noted in its claim construction opinion that "routers, firewalls, and similar servers that participate in typical network communication do not impede 'direct' communication between a client and a target computer."  Docket No. 266 at 8 (addressing the term "directly" in the context of "virtual private network").  VirnetX produced evidence that a NAT operated like a router, firewall or other similar servers and did not impede direct communication.  11/01/12 p.m. TT at 60:12–61:17; 120:13–123:10. Here, the jury was free to accept this testimony or reject some or all of Dr. Alexander's testimony.  In light of the foregoing, there was substantial evidence to support a finding that NATs allow direct communication.

Apple also alleges that VirnetX failed to produce sufficient evidence that the feature satisfies the "look up service" limitation[3], that the feature indicates that it supports establishing a secure communication link[4], and that the feature meets the domain name limitation[5], as required by the '504 and '211 Patents.  Docket No. 623 at 13–16.  However, VirnetX provided a detailed analysis how the FaceTime feature meets every single claim limitation.   VirnetX presented evidence that the feature meets the "lookup service" limitation when Apple's FaceTime servers return an IP address for the requested domain name, i.e. phone number or e-mail address.  *See* 11/01/12 a.m. TT at 110:20-113:12; PX 249; PX 548.   Additionally, VirnetX introduced evidence that the feature provides an indication, when FaceTime provides an accept push message which contains the information necessary to establish a secure communication link. 11/01/12 a.m. TT at 107:15–108:12; 122:9–23; PX 215.   Dr. Jones also explained how email addresses or telephone numbers are domain names as required by claims, since e-mail address and telephone numbers have corresponding IP addresses. 10/31/12 p.m. TT at 197:3–20; 11/01/12 a.m. TT at 114:9–115:1.

*Conclusion*

In light of the foregoing, Apple's motion for judgment as a matter of law regarding direct infringement is **DENIED.**

---

[3] The claim term "domain name service" was construed to mean "a lookup service that returns an IP address for a requested domain name to the requester."   Docket No. 266 at 15. However, the Court did not construe "domain name service system" because the claim language itself provided a description of the term, i.e. that it must "comprise an indication that [it] supports establishing a secure communication link."  *Id.* at 20.

[4] Claim 36 of the '211 Patent for example claims a "A non-transitory machine-readable medium comprising instructions executable in a domain name service system, the instructions comprising code for: connecting the domain name service system to a communication network; storing a plurality of domain names and corresponding network addresses; receiving a query for a network address; and **indicating in response to the query whether the domain name service system supports establishing a secure communication link**."(emphasis added).

[5] The claim term "domain name" was construed to mean a "name corresponding to an IP address."   Docket No. 266 at 16.

**Judgment as a Matter of Law Regarding Indirect Infringement**

Apple also moves for judgment as a matter of law with regard to VirnetX's claims of indirect infringement, arguing VirnetX failed to cite sufficient evidence to support a finding that Apple induced its customers to infringe the patents-in-suit.  Docket No. 623 at 17.

*Applicable Law*

Infringement is a question of fact that is reviewed for substantial evidence when tried to a jury.  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008).  Under 35 U.S.C § 271 (b), a party is liable for infringement if it "actively induces infringement of a patent."  "In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (internal quotation marks omitted).  Thus, to support a finding of inducement there must be "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities."  *DSU Med.Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).  Furthermore, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts," and that the infringer "knowingly induced infringement."  *Id.* at 1306.  A party has the requisite knowledge if it knew "that the induced acts constitute patent infringement," or was willfully blind to the infringement.  A party is willfully blind if it believed there was a high probably that the acts constituted patent infringement and took deliberate steps to avoid learning of the infringement.  *Global-Tech Appliances, Inc. v. SEB S.A.*, --- U.S. ----, 131 S. Ct. 2060, 2068, 2070 (2011); *see Smith & Nephew, Inc. v. Arthrex, Inc.*, 2013 U.S. App. LEXIS 1038, *10–12 (Fed. Cir. 2013).

Importantly however, a patentee may prove both indirect infringement and the corresponding direct infringement by circumstantial evidence.  *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006).   "There is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable per se."  *Id.*   Moreover, "[t]he drawing of inferences, particularly in respect of an intent-implicating question . . . is peculiarly within the province of the fact finder that observed the witnesses."  *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986); *see also Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (declining to disturb jury's verdict because intent to induce infringement "is a factual determination particularly within the province of the trier of fact").

Regarding inducement, Apple argues VirnetX failed to demonstrate that Apple was willfully blind to its customers' infringement, that Apple was aware of the patents prior to lawsuit, and that Apple intentionally encouraged its customers to infringe the patents-in-suit. Docket No. 623 at 17–20.  Apple concedes that VirnetX did present evidence that it was willfully blind to its customers' infringement, but it contends this evidence fails to support any of VirnetX's contentions.  Essentially, Apple is asking the Court to reweigh the evidence that was before the jury.

VirnetX did produce substantial evidence that Apple induced its customers' infringement of the patents-in-suit.  It presented testimony that Apple believed there was a high probability that its customers infringed and took deliberate actions to avoid confirming infringement. 11/01/12 a.m. TT at 37:14–44:23; 89:21–96:6; 96:18–97:5; 101:13–104:22; 138:17–140:3; 11/02/12 a.m. TT at 14:2–16:6; 17:1–20:9; 25:13–27:3; 30:1–32:1; 33:2–34:24; 50:14–54:10. Apple argues this evidence merely shows that Apple understood how its product worked, had

notice of the patents after the suit was filed, and that some of its employees avoided reviewing the patents-in-suit.  However, a jury is allowed to draw inferences from the evidence presented. Here, VirnetX presented evidence that Apple believed there was a high probability that the technology at issue was patented.  *See Global-Tech*, 131 S. Ct. at 2072; 11/01/12 p.m. TT at 114:1–119:20.  Also, VirnetX presented evidence of a clear pattern of behavior by Apple employees, which the jury was free to consider when determining whether Apple took deliberate steps to avoid confirming infringement.  Apple argues this is insufficient, because VirnetX failed to present testimony from individuals who routinely review patents; however, a jury is allowed to infer Apple possessed the requisite intent from all the facts as presented.  *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683 (Fed. Cir. 2008)(citing *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988)("The requisite intent to induce infringement may be inferred from all of the circumstances.").  Lastly, as Apple acknowledges, VirnetX presented evidence on how Apple instructs its customers to use the allegedly infringing features.  *See* 11/01/12 a.m. TT at 93:20–94:18; 138:5–16.  The fact that Apple instructed its customers to use the accused features in an infringing manner adequately supports the jury's finding.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318–19 (Fed. Cir. 2009)(upholding a jury verdict of induced infringement where the accused inducer designed the accused products to be used in an infringing manner and instructed its customers to use the accused products in an infringing manner).

Accordingly, Apple's Judgment as a Matter of Law as to Indirect Infringement is **DENIED.**

## Judgment as a Matter of Law as to Invalidity

Apple argues that no reasonable jury could have found that Takahiro Kiuchi's 1996 publication (the "Kiuchi reference") does not anticipate the asserted claims of the patents-in-suit.

Docket No. 623 at 21.  Specifically, Apple contends that its expert, Dr. Alexander, identified each and every claim limitation of the asserted claims in the Kiuchi reference, such that no reasonable jury could have found the patents-in-suit to be valid.

*Applicable Law*

Patents are presumed valid and overcoming this presumption requires clear and convincing evidence.  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1354 (Fed. Cir. 2010) (*en banc*).  A patent claim is invalid as anticipated if the claimed invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention by the applicant.  35 U.S.C. § 102(a) (2006).  Anticipation requires the presence in the prior art of each and every limitation of the claimed invention. *Amgen, Inc. v. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1366 (Fed. Cir. 2009).

*Analysis*

Upon review of the record, there is substantial evidence to support the jury's verdict regarding anticipation.  VirnetX presented evidence and testimony that the Kiuchi reference failed to disclose several claim limitations including, a "secure communication link," "virtual private network," "a DNS proxy server," "an encrypted channel," and "secure channel."  Docket No. 632 at 20–21.  Also, the jury may have simply disregarded some or all of Dr. Alexander's testimony, when finding the patents-in-suit were not anticipated.

The main dispute between the parties is whether the Kiuchi reference discloses a "secure communication link," i.e. a direct communication.  Dr. Alexander opined that the Kiuchi reference does disclose this limitation, because there is direct communication between the client-side proxy and the origin server.  *See* 11/02/12 p.m. TT at 167:22–168:12; 176:10–177:20. However, VirnetX contested this interpretation and presented evidence and testimony to the

contrary.  Dr. Jones, VirnetX's expert, conceded that while the connection between the client-side proxy and the origin server may be direct, the relevant connection is in fact the connection between the client computer and the origin server.  *See* 11/05/12 p.m. TT at 44:24–45:22.  Dr. Jones explained that this connection —the one between the client computer and the origin server — is not direct because the two devices are separated by two HTTP proxy servers.  These proxy servers stop and process the communications between the devices before initiating new connections to forward on, thus interrupting any direct connection between the two devices.  Docket No. 632 at 20; *see* 11/05/12 a.m. TT at 92:10–93:4.

Apple contends this distinction is irrelevant, because Dr. Alexander explained that both the user and the client-side proxy could be client computers, as required by the patents-in-suit.  Docket No. 623 at 23 (citing 11/05/12 a.m. TT at 47:15–25, 51:18–52:26).  However, there was evidence presented that one skilled in the art would not have identified the client-side proxy as a client computer.  11/05/12 a.m. TT at 45:19–50:24; 11/05/12 p.m. at 44:7–44:15.  When asked specifically about the connection between the client computer and the origin server, Dr. Alexander failed to explain whether this was truly a direct connection.  *See* 11/05/12 a.m. TT at 65:4–8.  Here, the jury was presented with conflicting evidence as to whether the Kiuchi reference disclosed a direct connection, as required by the asserted claims.  The jury was free to resolve the dispute in VirnetX's favor or disbelieve Dr. Alexander's testimony regarding the issue.

Additionally, the parties disagree whether the Kiuchi reference actually discloses "a plurality of domain names and corresponding network addresses." Docket No. 623 at 22; Docket No. 641 at 6.  At trial, Dr. Jones explained that even though the Kiuchi reference disclosed this limitation, the disclosure should not be considered.  *See* 11/05/12 p.m. TT at 39:11–42:1; 81:10–

86:9.  Dr. Jones contended that the Kiuchi reference was not enabling, because the system described would not actually work.  Dr. Jones stated this error was apparent when one examined the appendix of the Kiuchi reference.  *Id.*  Apple argues it was improper for VirnetX's expert, Dr. Jones, to consider extrinsic evidence, when opining that the Kiuchi reference was not an enabling reference.  Docket No. 623 at 22.

To anticipate, a prior art reference not only must disclose each and every limitation of the claimed invention, it must also "enable one of ordinary skill in the art to make the invention without undue experimentation."  *In re Gleave*, 560 F.3d 1331 at 1334 (Fed. Cir. 2009).  "[I]f the allegedly anticipatory disclosures cited as prior art are not enabled," the claimed invention is not anticipated.  *Elan Pharms., Inc. v. Mayo Founadation for Medical Ed. And Research*, 346 F.3d 1051 at 1054 (Fed. Cir. 2003).  "In order to show that it is entitled to judgment as a matter of law on its affirmative defense of invalidity, Apple must prove the essential elements of that defense to a virtual certainty."  *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 729 (E.D. Tex. 2011) (citing *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 735 F. Supp. 2d 560, 577 (E.D. Tex. 2010; *Bank of La. v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006)).  Here, there is a clear dispute about whether or not the Kiuchi reference is enabling even when the extrinsic evidence is not considered.

For each of the reasons stated above, Apple has not demonstrated it is entitled to judgment as a matter of law as to invalidity.[6]

**Judgment as a Matter of Law Regarding Damages**

Apple contends that the Court should grant judgment as a matter of law regarding damages, or in the alternative, order a new trial or a remittitur, because the jury's damages award

---

[6] Apple did not argue at trial that the patents-in-suit were obvious in light of the prior art.  Accordingly, this opinion only addresses anticipation.

has no legally sufficient basis and is unsupported by substantial evidence.  Docket No. 623 at 25–37.  Apple also alleges VirnetX is not entitled to damages prior to when Apple received actual notice of the asserted patents.  *Id.* at 37–39.

*Applicable Law*

A patentee is entitled to damages for infringement under 35 U.S.C. § 284. ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." *Id.*).  The burden of proving damages falls on the patentee.  *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003).  There are two alternative categories of infringement compensation: the patentee's lost profits, and the reasonable royalty the patentee would have received through arms-length bargaining.  *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

To ascertain the reasonable royalty, patentees commonly consider a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.  *Id.* at 1324–25; *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) (en banc).  Calculation of a reasonable royalty requires determination of two separate and distinct amounts: 1) the royalty base, or the revenue pool implicated by the infringement; and 2) the royalty rate, or the percentage of that pool "adequate to compensate" the plaintiff for the infringement.  *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009).

The entire market value rule "recognizes that the economic value of a patent may be greater than the value of the sales of the patented part alone."  *See King Instruments Corp. v.*

*Perego*, 65 F.3d 941, 951 n.5 (Fed. Cir. 1995). "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product [if] the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (citing *Lucent*, 580 F.3d at 1336). "[T]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative," or show that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Id.* (citing *Garreston v. Clark*, 111 U.S. 120, 121, 4 S.Ct. 291, 28 L.Ed. 371 (1884)); *see also Lucent*, 580 F.3d at 1336–67. For minor patent improvements, a patentee cannot justify using the entire market value of an accused product simply by asserting a lower royalty rate. *Uniloc,* 632 F.3d at 1319–20 (rejecting contrary interpretation of *Lucent*, 580 F.3d at 1338–39). Although a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty," *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995), the Court must ensure that the jury verdict is supported by sufficient evidence.

"A district court's duty to remit excessive damages is a procedural issue, not unique to patent law." *Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005). In the Fifth Circuit, a decision on remittitur and new trial is within the sound discretion of the trial court. *See Volger v. Blackmore*, 352 F.3d 150, 154 (5th Cir. 2003). The standard is highly deferential, and damages are set aside "only upon a clear showing of excessiveness." *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 857 (Fed. Cir. 2010) (quoting *Duff v. Werner Enters., Inc.*, 489 F.3d 727, 730 (5th Cir. 2007)). An excessive award exceeds the

"maximum amount calculable from the evidence."  *Carlton v. H.C. Price Co.*, 640 F.2d 573, 579 (5th Cir. 1981).

### *Lack of Evidence as to Direct Infringement*

Apple contends there is no legally sufficient basis to award damages for direct infringement as to the '504, '211, and '135 Patents, because VirnetX failed to demonstrate Apple directly infringed the '504, '211, and '135 Patents.  Docket No. 623 at 25.  Apple's argument is premised on the Court granting Apple judgment as a matter law as to indirect infringement.  *Id.* at 25–27. Because the Court has already denied this request, Apple's argument regarding any lack of evidence is unpersuasive.

### *Lack of Substantial Evidence to Support the Jury's Damages Award*

Apple also argues it is entitled to judgment as a matter of law with respect to damages, because VirnetX's damages theory invoked the entire market value rule without complying with the rule, VirnetX's reasonable royalty rate of 1% was not supported by the evidence, and VirnetX's alternative damages model, the Nash Bargaining Solution, does not support the damages award.  Docket No. 623 at 27–39.

As an initial matter, the jury departed from both damages models presented at trial. VirnetX's damages model set a floor of $708 million, while Apple proposed a lump sum award of $9.1 million.  11/01/12 p.m. TT at 92:24–93:1; 11/05/12 a.m. TT at 155:19–25.  After consideration of the evidence presented at trial, the jury awarded a lump sum of $368,160,000 in damages.

### 1.   Entire Market Value Rule

Apple argues that VirnetX invoked the entire market value rule without actually complying with the rule, because Mr. Weinstein, VirnetX's damages expert, considered the

entire value of Apple's devices without demonstrating that the accused features created the basis for customer demand or substantially created the value of the component parts.  Docket No. 623 at 27.   Apple cites to Mr. Weinstein's testimony where he acknowledged that the allegedly infringing features merely contribute to the sale of the accused devices.  *See* 11/01/12 p.m. TT at 170:21–171:21; 222:10–13.  Apple contends that even if the infringing features did in fact drive demand for the accused devices, it is irrelevant because the patents-in-suit only cover a small portion of the infringing features, therefore the entire market value rule still cannot be considered.  *See* 10/31/12 p.m. TT at 17:5–18:12; 11/01/12 p.m. TT at 166:21–25.

In response, VirnetX argues Apple is misconstruing its damages theory, as VirnetX's primary damages theory sought to determine a reasonable royalty, considering the revenues from the smallest saleable unit of the accused products.  Docket No. 632 at 23; s*ee* 11/01/12 p.m. TT at 124:13–20.  VirnetX never disclosed the entire revenue of Apple's accused devices, but rather used an apportioned base, which excluded roughly 20% of the total revenue from the accused products, when calculating a reasonable royalty.  *See* 11/01/12 p.m. TT at 125:1–22; 128:14–129:8.  VirnetX contends it was permissible for its expert to consider the smallest saleable infringing unit when determining the royalty base since the unit had a "close relation to the claimed invention."  Docket No. 623 at 25 (quoting *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 288 (N.D. NY 2009); *see LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).

Apple counters that if VirnetX wished to calculate its royalty based on the smallest saleable patent-practicing unit, VirnetX needed to demonstrate a close relation between the accused devices and the patented inventions, which it failed to do here.  Docket No. 636 at 11; *see* 10/31/12 p.m. TT at 17:5–19:8.  However, VirnetX did provide some evidence that the

infringing features practicing the patented inventions necessarily utilized other aspects of the accused devices.  *See* 10/31/12 a.m. TT at 66:1–22; 89:9–93:6; 100:3–101:22; 106:19–107:2; 11/01/12 a.m. TT at 47:22–55:18.

Additionally while Apple contests the royalty base, it failed to advance a credible alternative.  At trial, Apple argued the royalties should be calculated using $29 as the base for all the accused devices.  This price was the price of a software upgrade for the Mac computers.  *See* 11/05/12 a.m. TT at 147:16–149:6 (Mr. Vellturo, Apple's damages expert, noting that this upgrade allowed the computers to use the accused features).[7]  However, Apple never charged its customers for a similar upgrade for its iOS devices, including the iPhone.  11/05/12 p.m. TT at 28:20–29:7.  Apple never produced any other testimony or evidence regarding how one should properly calculate the damages for the iOS devices, instead it relied solely on the upgrade price for a dissimilar product.  If Apple had advanced a different theory showing the iOS device was not the smallest saleable unit, there may have been a different result.

In light of the foregoing, VirnetX did not implicitly invoke the entire market value rule in its damages theory.

### 2.  Reasonable Royalty Rate

Apple also contends Mr. Weinstein's proposed 1% royalty rate is unsupported by the evidence.  Docket No. 623 at 33.  To support his 1% royalty rate, Mr. Weinstein considered several licenses, including the In-Q-Tel license, the SafeNet/SAIC agreement, the SAIC/VirnetX agreement, the Microsoft license, the Aastra license, the Mitel license, and the NEC license.  Apple argues that almost all of these licenses should not be considered as they postdate the hypothetical negotiation of June 2009.  *Id.*  11/01/12 p.m. TT at 201:23–202:9.  Without these

---

[7] VirnetX's damages expert, Mr. Weinstein, did use $29 as his base when calculating damages related to the Mac computers.  *See* 11/05/12 a.m. TT at 148:5–13.

licenses, Apple contends there were no comparable licenses to consider at the time of the negotiation. *Id.* For example, the In-Q-Tel license predates even the conception of the patents, while the SafeNet/SAIC agreement was canceled prior to any payment from SafeNet, and the SAIC/VirnetX license was more than a mere license, as it transferred interest of the patents-in-suit. Docket No. 623 at 33; 11/01/12 p.m. TT at 186:9–187:12, 202:5–205:12.

Additionally, Apple criticizes Mr. Weinstein's reliance on VirnetX's licensing policy, which it contends at the time of the hypothetical negotiation was merely a "wish" rather than an actual policy. *See* 11/01/12 p.m. TT at 160:22–161:9. Apple contends there is no evidence that it would have agreed to pay a running royalty in line with this policy, especially in light of the Microsoft agreement, which VirnetX admits did not conform to its licensing policy. 10/31/12 p.m. TT at 137:8–21. Apple also argues Mr. Weinstein did not properly consider Apple's potential non-infringing alternatives. Docket No. 623 at 34. At trial, VirnetX conceded that Apple's FaceTime feature did not infringe the patents-in-suit if the calls were made via a relay server. 11/01/12 a.m. TT at 98:5–14; 99:3–100:1. Even Mr. Weinstein acknowledged the importance of considering non-infringing alternatives in the reasonable royalty analysis. 11/01/12 p.m. TT at 209:2–11. However, Apple argues neither VirnetX nor Mr. Weinstein attempted to assess the feasibility of these alternatives before dismissing their relevancy. Docket No. 623 at 35.

VirnetX did present substantial evidence at trial to support its proposed royalty rate. Mr. Weinstein provided a detailed reasonable royalty analysis to the jury. 11/01/12 a.m. TT at 97:23–122:8. VirnetX presented evidence why such a royalty rate would be justified in light of the value of the technology, noting the accused features were key to Apple attracting potential enterprise customers that valued security in their communications and offered the ease of

operation valued by Apple customers. 11/01/12 p.m. TT at 114:1–119:20.  Indeed, the accused features have been used extensively by Apple customers, with over 2.6 billion FaceTime calls being made since June 2010.  11/01/12 p.m. TT at 119:13–20.  Additionally, VirnetX introduced several license agreements and its own licensing policy to further support the royalty rate.  While some of these license agreements postdate the hypothetical negotiation, they help demonstrate what entities would be willing to pay for the technology at issue.  *See* 11/01/12 p.m. TT at 108:7–110:16.  VirnetX also introduced evidence related to its own licensing policy, though VirnetX never exclusively relied upon its policy alone to justify the royalty; instead it considered the policy in light of all the other *Georgia-Pacific* factors.  *See* 11/01/12 p.m. TT at 103:8–19.  As to the relevance of non-infringing alternatives, Apple agrees that these alternatives need to be feasible.  *See Grain Processing Corp. v. American Maize-Prods. Co.,* 185 F.3d 1341, 1349 (Fed. Cir. 1999).  Here, VirnetX presented evidence Apple's proposed alternatives were not.  While FaceTime calls could go through relay servers, VirnetX established that routing all calls through these servers would not be a viable alternative, in light of the projected costs and downgrade in service.  *See* 11/01/12 p.m. TT at 215:23–216:4; 11/01/12 a.m. TT at 140:4–143:19.  In sum, VirnetX presented substantial evidence to support Mr. Weinstein's reasonable royalty rate of 1%.

    3.  Nash Bargaining Solution

Apple also attacks Mr. Weinstein's alternative damages theory, based on the Nash Bargaining Solution ("NBS").  Using its alternative damages model, VirnetX calculated that its damages for only the FaceTime feature would be $588 million.  11/01/12 p.m. TT at 136:11–146:19; 212:23–219:4.  Apple acknowledges there are alternative methods of calculating reasonable royalties; however, it argues Mr. Weinstein did not use the generally accepted methods of applying NBS and thus his analysis is unreliable.  Docket No. 623 at 35.  Mr.

Weinstein based his calculations on the incremental profit associated with adding a front-facing camera, after equating the value of the front-face camera to the FaceTime feature. *Id.*; 11/01/12 p.m. TT at 218:4–11.   Instead, Apple argues Mr. Weinstein should have determined the additional profits associated with the use of the technology. *Id.*; 11/01/12 p.m. TT at 138:12–14. Also, Apple contends Mr. Weinstein failed to explain why a 45%–55% profit split between VirnetX and Apple would have occurred. *Id.* at 35; *see* 11/01/12 p.m. TT at 141:13–17.   Apple asserts this arbitrary profit split is akin to the disdained "25% rule," [8] and does not support a damages award since it has no basis in reality.

Mr. Weinstein adequately supported his alternative damages theory.  First, he calculated the contribution of the "FaceTime" feature to Apple's total profits by estimating the price differential between the accused product and the last previous version of the product not capable of supporting the feature.  11/01/12 p.m. TT at 143:13–144:17; 219:1–6.  Mr. Weinstein then reduced this revenue by the percentage of the revenue associated with the addition of the "FaceTime" feature.  In this analysis, Mr. Weinstein relied on the price of the camera, because the addition of the camera enabled the feature. *See* 11/01/12 p.m. TT at 215:18-22. Additionally, Mr. Weinstein accounted for the 45%–55% profit split in his analysis, explaining that VirnetX would have been in a weaker bargaining position at the time of the negotiation because of its financial situation.[9]   11/01/12 p.m. TT at 216:5–217:4.  Accordingly, Apple would have benefitted from this inequity in bargaining positions, and Mr. Weinstein modified the profit split

---

[8] Previously, the 25 percent rule had been used to approximate a reasonable royalty rate.  However, the Federal Circuit has since held that "the 25 percent rule is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation.  Evidence relying on the 25 percent rule of thumb is thus inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue." *Uniloc USA, Inc.v. Microsoft Corp.*, 632 F.3d 1292,1312–13, 1315 (Fed. Cir. 2011).

[9] Traditionally, there is a 50-50 split of profits in the Nash Bargaining Solution.  Apple first complains that Mr. Weinstein failed to properly explain his deviation from the traditional NBS approach.  Apple's complaint is perplexing, as Weinstein's alleged error in this situation actually favors Apple.  Apple then complains Mr. Weinstein failed to explain why he only reduced VirnetX's share to 45% as opposed to a lower figure, but Mr. Weinstein did explain why he chose to apply a 45-55 split. *See* 11/01/12 p.m. TT at 216:5–218:3.

to reflect this.   Contrary to Apple's assertions, VirnetX did provide substantial evidence to supports its alternative damages theory.

    4.   Reduction of Jury Award

Apple also requests that the Court adjust the damages award, because there is no basis to award damages for any period prior to the time Apple received actual notice of the patents-in-suit.   Docket No. 623 at 37.   Apple argues VirnetX is not entitled to pre-litigation damages in this case because it failed to show Apple knew of the patents prior to the litigation.   *Id.*   If the Court finds VirnetX failed to show Apple knew of the patents prior to their assertion, Apple alleges that the jury had no information to limit their award, since Mr. Weinstein failed to produce any figures that subtracted pre-suit sales.   *Id.* at 38–39.   Therefore, the jury could not have rendered a "properly-limited damages award."   *Id.* at 39.

However, VirnetX produced evidence that Apple did have pre-suit knowledge of the patents-in-suit.   *See* 11/01/12 a.m. TT at 91:7–92:20 (Dr. Jones explaining that the VirnetX/Microsoft settlement was well publicized and when asked about this settlement, Apple could not deny someone knew about the license at Apple).   Even assuming arguendo that VirnetX had failed to demonstrate Apple had actual knowledge of the patents prior to this litigation, VirnetX still produced figures that discounted pre-suit sales.   Mr. Weinstein specifically explained that the damages at most would be reduced by $52 million.  11/01/12 p.m. TT at 131:16–134:17.   Therefore, there is no basis to grant Apple's request to reduce the jury award.

    *Conclusion*

In light of the foregoing, Apple's request for judgment as a matter of law in regards to damages is **DENIED.**

**Motion for a New Trial or Remittitur**

Apple argues, in the alternative, that it should be granted a new trial or remittitur, because: (1) the Court's jury instruction regarding damages was erroneous; (2) Mr. Weinstein's testimony should have been excluded or stricken; (3) the Court did not allow Apple to adequately rebut VirnetX's evidence of inducement;  and (4) the verdict is against the greater weight of evidence.  Docket No. 623 at 39–49.  Apple also requests a new trial or remittitur if the Court finds the claims of either direct or induced infringement are not unsupported by substantial evidence.  *Id.*  As previously discussed, there was substantial evidence to support VirnetX's claims of direct and induced infringement; therefore, Apple's request with respect to findings of infringement is **DENIED.**

*Jury Instruction*

Apple argues the Court erroneously instructed the jury about the royalty base it could consider when awarding damages.  Docket No. 623 at 39.  The Court gave the following instruction:

> In determining a royalty base, you should not use the value of an entire apparatus or product unless **either:** (1) the patented feature creates the basis for customers' demand for the product, or the patented feature substantially creates the value of the other component parts of the product; or (2) the product in question constitutes the smallest saleable unit containing the patented feature.

Docket No. 597 at 27–28 (emphasis added).  Apple contends this instruction allowed the jury to consider the entire value of the accused devices without complying with the entire market value rule.  Docket No. 623 at 40–46.  While Apple recognizes the concept of a "smallest saleable patent practicing unit," it argues this instruction runs afoul of decades of case law that states the entire value of a product may only be considered "[if] the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA,*

*Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (citing *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009); Docket No. 632 at 41–45.  Apple alleges the Court's error was extremely prejudicial, because it allowed the jury to consider an astronomically large royalty base, thus skewing the damages in VirnetX's favor.  *Id.* at 45.

VirnetX argues that Apple again is conflating the entire market value rule and the smallest saleable patent-practicing unit.  Docket No. 632 at 40–45.  VirnetX does not argue with Apple about the requirements of the entire market value rule.  Rather, VirnetX contends there are instances when a jury may consider the value of an entire product if the whole product is the smallest saleable unit with a "close relation to the claimed invention." *LaserDynamics, Inc. v. Quanta Comp. Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *see Broadcom Corp. v. Emulex Corp.*, No. 09-01058, 2011 U.S. Dist. LEXIS 154416 at *14 (C.D. Cal. Dec. 13, 2011)("The requirements of the entire market value rule must be met only if the royalty base is not the smallest saleable unit with close relation to the claimed invention.")  Thus, if the smallest saleable unit is the product itself, then the entire market value rule should not be considered, since the rule is an exception that allows a jury to consider the entire revenues of a multicomponent product when the patented feature is only a small aspect of the product.  Additionally, VirnetX refutes claims that the jury in fact considered the entire market value of the accused devices in this case, as the figure was never actually disclosed to the jury.  Docket No. 632 at 45.

In this instance, the Court's instruction was not erroneous.  While Apple is correct that the entire market value rule when applied requires a showing by plaintiff that the patented feature either drove demand for the entire product or substantially created the value of the component parts, the Court's instruction explained another alternative when the jury could consider the entire value of a product.  There are instances when the smallest saleable patent-

practicing unit is the entire product.   Depending on the claim language of a patent, it is foreseeable that an entire product is required to practice the invention.   *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1550 ("All the components together must be analogous to components of a single assembly or be parts of a complete machine, or they must constitute a functional unit. Our precedent has not extended liability to include items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage.").   Accordingly, the Court's instruction to the jury was proper.

### Mr. Weinstein's Testimony

Apple also reasserts its pre-trial *Daubert* motion and argues the Court erred in not excluding or striking Mr. Weinstein's testimony.   Docket No. 623 at 46.   To calculate VirnetX's damages, Mr. Weinstein applied several different damages models, including the Nash Bargaining Solution and a reasonably royalty rate based on a hypothetical negotiation.   Apple contends Mr. Weinstein relied upon insufficient data and he incorrectly applied these damages models in calculating VirnetX's damages.   *Id.* VirnetX disputes Apple's contentions and argues Mr. Weinstein's calculations were reliable and the Court did not err by admitting his testimony. Docket No. 632 at 46.

The Court has already addressed the sufficiency of Mr. Weinstein's data and the reliability of his alternative damages model.   Additionally, prior to the trial, the Court made a preliminary determination that Mr. Weinstein's testimony was admissible because his opinions were well-reasoned and tied to the facts of the case, thus placing the burden on Apple to discredit his testimony at trial. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 595 (1993) ("Vigorous cross–examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence.")
Accordingly, it was proper for Mr. Weinstein to testify.

### *Evidentiary Rulings*

Apple also argues it is entitled to a new trial because the Court erred in allowing VirnetX
to present testimony from Apple engineers in order to establish Apple's liability for inducement,
without affording Apple the opportunity to discuss the pending re-examinations at the USPTO.
Docket No. 623 at 47–48.  Apple first argues the Court erred by allowing VirnetX to present the
testimony of Apple employees, since this evidence gave the incorrect impression that Apple as a
company disregards others' intellectual property.  However, Apple has not demonstrated it was
an error to admit this evidence.  Contrary to Apple's assertion, this evidence was relevant to
VirnetX's contention that Apple took steps to avoid confirming infringement.  From this
evidence, the jury could have inferred Apple as a company actively avoids investigating the
scope of prior art when it is developing a "new" application.  While Apple argues this evidence
should have been excluded because it was prejudicial, Apple has failed to explain why this
concern outweighs the probative value of the evidence.  *See* FED. R. EVID. 403.

Apple also contends the Court erred when it prevented Apple from refuting VirnetX's
contentions, with evidence Apple initiated re-examinations at the USPTO to contest the validity
of the patents-in-suit.  *Id.*  Apple argues this error was further compounded by the Court's
instruction that the jury could consider "whether or not Apple obtained the advice of a competent
lawyer" or "whether or not it knew of the patents or was willfully blind to the patents when
designing and manufacturing its products."  Docket No. 597 at 17.  Without evidence that Apple
in fact took steps after learning of VirnetX's allegations of patent infringement, Apple argues the

jury had an incomplete and flawed understanding of the facts, which undoubtedly influenced its consideration of VirnetX's claim of induced infringement.  Docket No. 623 at 48.

It is within the purview of the Court to exclude highly prejudicial evidence that risks misleading the jury.  *Id.*  Here, the re-examinations were still ongoing, meaning there was no final determination by the USPTO with respect to the validity of the patents-in-suit.  If evidence of the ongoing re-examinations had been allowed, it could have improperly influenced the jury's decision regarding validity.  *See Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1342 (Fed. Cir. 2009)(finding the district court did not err in excluding evidence of a pending re-examination, noting the risk of jury confusion was high if such evidence was introduced).  Apple was free to bring in other evidence that did not risk misleading the jury as to other trial issues to combat VirnetX's allegations of willful blindness.  Apple has not established it was an error to exclude evidence of the re-examinations.

### Weight of the Evidence

Lastly, Apple summarily asks the Court to exercise its discretion and grant a new trial, because the great weight of the evidence supports Apple's contentions that it does not infringe the asserted claims, these claims are invalid, and the damages award is unsupported.  For reasons previously stated, the great weight of the evidence does not support Apple's arguments.

### Conclusion

In light of the foregoing, Apple's alternative motion for a new trial or remittitur is **DENIED.**

## VIRNETX'S MOTION FOR POST-VERDICT DAMAGES TO THE TIME OF JUDGMENT, PRE-JUDGMENT INTEREST, AND POST-JUDGMENT INTEREST and VIRNETX'S AMENDED MOTION FOR POST-VERDICT DAMAGES

In light of the jury's verdict, VirnetX now requests pre-judgment and post-judgment interest, and post-verdict damages. Docket No. 620 at 1.  Apple does not oppose awarding

VirnetX pre-judgment interest, however it disputes which interest rate should be awarded. Docket No. 630 at 2–4.   Additionally, Apple does not contest that VirnetX is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961 (a).   *Id.* at 4.   However, the parties dispute whether VirnetX should be awarded post-verdict damages.

### *Pre-judgment Interest*

Apple does not oppose awarding VirnetX pre-judgment interest, however it disputes which interest rate should be used.  Docket No. 630 at 2–4.  VirnetX asks the Court to award the Texas statutory interest rate of 5%, compounded quarterly, while Apple has requested the Court award the periodic prime interest rate of 3.25%, compounded quarterly.  Docket No. 620 at 5; Docket No. 638 at 2.  In keeping with the standard practice of this Court, VirnetX shall be awarded pre-judgment interest on the $368,160,000.00 damage award at the prime rate, compounded quarterly, such that the pre-judgment interest is $8,755,381 through October 31, 2012, with daily interest of $33,561.  *See Soverain Software LLC v. J.C. Penney Corp.*,No. 6:09-cv-272, 2012 U.S. Dist. LEXIS 151102, *33 (E.D. Tex. Aug. 9, 2012); *Clear With Computers, LLC v. Hyundai Motor Am., Inc.*, No. 6:09-cv-479, slip op. at 14 (E.D. Tex. Jan. 9, 2012); *Fractus, S.A. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 2012 U.S. Dist. LEXIS 80284, *143 (E.D. Tex. 2012); *Tele-Cons, et al. v. General Electric Co, et al.*, No. 6:10-cv-451, slip op. at 2 (E.D. Tex. Sept. 29, 2011); *ACQIS LLC v. IBM Corp. et al.*, No. 6:09-cv-148, slip op. at 1 (E.D. Tex. June 8, 2011).

### *Post-Verdict Damages*

Apple asks the Court to deny VirnetX's request for post-verdict damages, because it contends VirnetX has grossly overestimated its damages  Docket No. 630 at 1.  In its original request, VirnetX had extrapolated from Apple's disclosed sales figures to determine the number

of sales of accused products post-verdict.  Docket No. 620 at 8.  Apple contends VirnetX's post-verdict damages model overestimates the number of sales post-verdict, because VirnetX improperly assumed the sale of accused products would remain consistent throughout the year.  Docket No. 630 at 2.  Apple argues this is incorrect, because its release of new products in late 2012 would have decreased the demand for the accused products.  Historically, when Apple released a new model, sales of the prior iteration would decline.  Therefore, Apple contends VirnetX's request is too high.

At the post-trial hearing, VirnetX emphasized it only had sales information up to June 2012 and therefore could not determine the impact of new products on accused product sales.  In light of the ongoing dispute as to how the release of new products would actually affect accused product sales, the Court requested additional briefing on the matter.  Docket No. 647.  The Court ordered Apple to produce its most current sales data up to December 31, 2012 and ordered VirnetX to file an amended request in light of Apple's new sales figures.

VirnetX amended its request in light of the new data to $330,201 per day from November 6, 2012 through the date of the final judgment.  Docket No. 657 at 2.  Apple still disputes this figure, claiming VirnetX again did not sufficiently discount the post-verdict damages to reflect the decrease in accused product sales.  Docket No. 664 at 2.  Apple instead proposes awarding post-verdict damages of $279,229 a day.[10]  *Id.*

Upon further review of VirnetX's and Apple's competing proposals, the Court rejects Apple's proposal.  Essentially Apple is asking VirnetX to look into a crystal ball to divine if and how accused product sales will further decrease.  VirnetX was only given sales information up to

---

[10] Apple estimated the decrease in accused product sales by averaging the decrease in sales of other older models after the release of new products.  However, the percentage change varied widely ranging, from less than -5% to over -60%.  It is uncertain at this moment whether the accused products in this case would experience such a significant shift or not.

December 31, 2012, and VirnetX's methodology is reasonable in light of the almost impossible task Apple is now requesting.

### Conclusion

VirnetX's request for pre-judgment interest and post-judgment interest is **GRANTED IN PART** and **DENIED IN PART**. Additionally, VirnetX's amended motion for post-verdict damages is **GRANTED.**

## VIRNETX'S MOTION FOR PERMANENT INJUNCTION

VirnetX also requests an order permanently enjoining Apple from infringing the patents-in-suit. Docket No. 621 at 1.[11]

### Applicable Law

In determining whether to issue a permanent injunction in patent cases, courts apply the four factor test provided for in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006). A party is entitled to a permanent injunction only if: "(1) [the party] has suffered an irreparable

---

[11] VirnetX proposed the following language: Apple, Inc., its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise are permanently restrained and enjoined from performing the following actions during the term of U.S. Patent Nos. 6,502,135 and 7,490,151: 1. making, offering to sell, selling, importing, and/or using VPN on Demand Infringing and Future Products in or into the United States; 2. instructing or encouraging anyone (alone or jointly with Apple) to make, offer to sell, sell, import, and/or use in or into the United States VPN on Demand Infringing and Future Products; and 3. selling a component with a capability identical to or not more than colorably different from the capability of determining whether to initiate a VPN based on comparing a domain name to a list of domain names. Notwithstanding the foregoing, Apple is not enjoined from performing the above actions with respect to VPN on Demand Infringing and Future Products that were included in the royalty base at trial or covered by the Court's *per diem* through judgment. Apple, Inc., its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise are permanently restrained and enjoined from performing the following actions during the term of U.S. Patent Nos. 7,418,504 and 7,921,211: 1. making, offering to sell, selling, importing, and/or using one or more FaceTime Infringing and Future Servers in or into the United States; 2. instructing or encouraging anyone, alone or jointly with Apple, to make, offer to sell, sell, import, and/or use (including by distributing computer code or a FaceTime Infringing and Future Product that includes the capability of using ) in or into the United States one or more FaceTime Infringing and Future Servers; 3. instructing or encouraging anyone, alone or jointly with Apple, to use (*e.g.*, use by a FaceTime Infringing and Future Product) one or more FaceTime Infringing and Future Servers that are in the United States; and 4. selling a component with a capability identical to or not more than colorably different from the capability of supporting establishing a non-relayed, encrypted FaceTime call. Notwithstanding the foregoing, Apple is not enjoined from supporting establishment of non-relayed, encrypted FaceTime calls between two or more FaceTime Infringing and Future Products that were all included in the royalty base at trial or covered by the Court's *per diem* through judgment. Docket No. 621, Ex. 5 at 2–4.

injury; (2) that remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391. The Supreme Court held "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.*

*Irreparable harm and monetary damages*

VirnetX argues Apple's infringement irreparably harmed the company, because Apple's infringement prevented VirnetX from releasing its own technology, the Gabriel technology. Docket No. 621 at 4. VirnetX has been developing this technology, which practices the claimed invention and in VirnetX's opinion, could be implemented by Apple to replace Apple's infringing software and servers. *Id.* at 4, 6; *see* 10/31/12 a.m. TT at 119:9:123–1. VirnetX contends that Apple's infringement prevented the company's entrance into the market, because Apple's infringing products have saturated the market, thus making it impossible for VirnetX to compete. *Id.* at 4–5.

Additionally, Apple's decision to infringe VirnetX's patents instead of licensing the Gabriel technology prevented the implementation of VirnetX's technology on millions of devices. *Id.* at 6. Specifically, VirnetX asserts an agreement between Apple and VirnetX would have given VirnetX a "beachhead in the industry." *Id.* This "beachhead" would have allowed VirnetX to "scale [its] infrastructure," "hire more developers," and provided VirnetX "a venue for participating in this technology and seeing it go out into the – into the marketplace." *Id.* at 6 (quoting 10/31/12 a.m. TT at 118:17–119:4).

Apple counters that VirnetX has not been irreparably harmed, because VirnetX has misrepresented the nature of the Gabriel technology, and VirnetX has not demonstrated its failure to succeed in the market is a result of Apple's alleged infringement. Docket No. 631 at 2–7.  Apple disputes the relevance of VirnetX's Gabriel technology in the analysis, since the product is not even commercially available.  *Id.* at 4.  In the absence of any commercially available product, Apple contends VirnetX cannot allege it has been irreparably harmed, because VirnetX does not compete with Apple products.  *Id.* at 3–4.  Without a product, VirnetX cannot allege it has lost market share, brand recognition, or customer goodwill.  *Id*. at 3.  Even if VirnetX did have a product, Apple contends VirnetX would not directly compete with Apple, since Apple sells hardware whereas products implementing the patents-in-suit would cover software.  *Id.* at 3–4.

Additionally, Apple argues VirnetX has failed to prove Apple's infringement affected VirnetX's presence in the marketplace.  First, Apple contends there is no evidence that demonstrates Apple's infringement prevented VirnetX's entrance into the market.  Docket No. 631 at 5.  VirnetX has acknowledged that its Gabriel technology is capable of running on other operating systems, such as the Android operating system.  *Id.* at 6; *See* 10/31/12 a.m. TT at 120:2–6; 120:16–121:5; 10/31/12 p.m. TT at 10:12–18.  However, there is nothing in the record to suggest VirnetX was unable to sell its technology or license its patents to other smartphone, tablet or computer manufacturers, because of Apple's infringement.  *Id.* at 5–6; *see* 10/31/12 a.m. TT at 130:12–132:12.  In fact, VirnetX entered licensing agreements after June 2009, the time when Apple began selling the accused products. *Id.* at 5.

Apple also argues VirnetX has failed to demonstrate that Apple's infringement deprived VirnetX of a significant business opportunity.  Docket No. 631 at 7.  Apple argues that VirnetX

has improperly assumed that Apple would have chosen to license the Gabriel technology in 2009 instead of implementing a design–around or opting to license the patents–in–suit.  *Id.*  However, there is nothing to suggest that Apple would have chosen to license the Gabriel technology, especially considering at the time Apple began selling the accused products VirnetX's technology was incapable of running on many Apple devices.  *Id.*, 10/31/12 p.m. TT at 9:10–10:13 (Dr. Short, one of the inventors of the patents–in–suit, acknowledging that the Gabriel technology does not run on the iOS operating system).

VirnetX's Gabriel technology is currently unavailable commercially.  *See* 10/31/12 p.m. TT at 11:15–12:11 (Dr. Short stating there are no commercial implementations of the Gabriel technology currently, no companies are running their own beta testing of the product, and there has only been internal testing of the product).  Even assuming VirnetX's technology was available for purchase, Apple does not directly compete with VirnetX.  Apple sells phones, not security software.  Additionally, Apple's sale of cell phones has not restricted VirnetX's ability to market and sell its Gabriel technology to other tablet, cellphone or computer manufacturers. VirnetX's damages are limited to the loss of Apple as a customer.

VirnetX has also argued the loss of Apple as a licensee further impacted its ability to establish itself in the marketplace.  While evidence of past harm can be considered by the Court, the Court cannot engage in counterfactual thinking and determine what might have been.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010). Assuming Apple could have implemented VirnetX's technology for all the accused products, and assuming Apple would have decided to license the technology, one cannot say this would have guaranteed VirnetX's success. In absence of any evidence, Apple cannot be held solely responsible for VirnetX's failure to obtain a foothold in the market.

Here, Apple's infringement has caused VirnetX to lose Apple as a licensee, which can be remedied with monetary damages.  VirnetX is not excluded from selling or licensing its products to other companies in the market and has not suffered any loss of good will, lost profits or market share.  Accordingly, VirnetX has not demonstrated that it will suffer irreparable harm absent a permanent injunction and that monetary damages are an insufficient remedy.

*Permanent Injunction: Balance of Hardships and Public Interest*

VirnetX has not demonstrated that Apple's infringement is responsible for VirnetX's failure to enter and be successful in the marketplace.  Apple's sale of infringing products has not restricted VirnetX's ability to approach other companies or sell its products to consumers. Additionally, while a licensing agreement between Apple and VirnetX may have boosted VirnetX's position in the market, there is no evidence demonstrating that VirnetX lost goodwill because of Apple's infringement.

With respect to Apple, while throughout the trial it attempted to minimize the importance of the infringing features in its products, Apple still bears a considerable burden to comply with the proposed injunction.  The most recent estimates project the cost to comply at $50.8 million. Docket No. 653, Ex. 2 at 2; *Id.*, Ex. 3 at 3.  Additionally, though VirnetX only seeks to enjoin the use of the infringing feature and not the entire devices, an injunction would not only harm Apple, but also its customers and other third parties.  Although the Court is concerned about the great disparity between Apple's proposed costs to comply with an injunction presented at trial and those presented post-trial, the balance of hardships weigh against enjoining Apple.

*Conclusion: Permanent Injunction*

Accordingly, VirnetX's Motion for a Permanent Injunction is **DENIED.**

*Ongoing Royalty*

If the Court does not grant a permanent injunction against Apple, VirnetX "requests that the Court order the parties to negotiate a license regarding Apple's future use of VirnetX's patented technology." Docket No. 621 at 18. If the parties fail to reach an agreement, VirnetX then asks that Court to impose an ongoing royalty. *Id.* The Federal Circuit has encouraged courts to allow the parties to negotiate a license amongst themselves regarding the future use of a patented technology prior to the court imposing a royalty. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315 (Fed. Cir. 2007); *Telecordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1378–79 (Fed. Cir. 2010).

Accordingly, to provide finality to the trial, the Court **SEVERS** VirnetX's claim for an ongoing royalty into a separate cause of action. *See* FED.R.CIV.P. 21. ("[t]he court may sever any claim against a party."). The parties are **ORDERED** to meet and confer to schedule mediation within 45 days of this order to attempt to negotiate a license. Should the parties fail to agree regarding Apple's future use of VirnetX's patents at the mediation, VirnetX is **ORDERED** to file the appropriate motion.

## VIRNETX'S MOTION FOR ENTRY OF JUDGMENT, REQUEST FOR ATTORNEYS' FEES, AND JUDGMENT AGAINST APPLE ON APPLE'S LATE-ABANDONED COUNTERCLAIMS AND DEFENSES

VirnetX requests attorneys' fees in light of Apple's litigation misconduct and the *Read* factors. VirnetX also asks for entry of judgment against Apple and specifically requests judgment against Apple on Apple's defenses and counterclaims that were pending at the time of trial, but were not actually presented to the jury.

*Attorneys' Fees*

Attorneys' fees and costs may be awarded in "exceptional cases" to the "prevailing party." 35 U.S.C. § 285. Awarding attorneys' fees under § 285 is a two-step process. *Cybor Corp. v.*

*FAS Tech.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998).  "First, the district court must determine whether a case is exceptional, a factual determination reviewed for clear error.   After determining that a case is exceptional, the district court must determine whether attorney fees are appropriate."  *Id.* (internal citation omitted); *Delta-X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 413 (Fed. Cir. 1993).

"Exceptional cases usually feature some material, inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violated Federal Rule of Civil Procedure 11, or like infractions." *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.,* 459 F.3d 1311, 1321–22 (Fed. Cir. 2006).  "[E]xceptional cases" may, but are not required to, include the jury's finding of willfulness.  *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 518 F. Supp. 2d 876, 895 (S.D. Tex. 2007) (citing *Avia Group Int'l, Inc. v. L.A. Gear Ca., Inc.*, 853 F.2d 1557, 1567 (Fed. Cir. 1998)).  For example, a case may be exceptional based solely on litigation misconduct and unprofessional behavior.  *Rambus, Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003); *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002).  Ultimately, "[t]he decision to increase damages is committed to the discretion of the trial judge."  *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990).

VirnetX argues Apple's litigation misconduct and the application of some *Read* factors make this case exceptional.  Docket No. 625 at 2, 11.  Specifically, VirnetX claims Apple disregarded the Court's orders on several occasions, urged meritless defenses, concealed its primary infringement defense until the eve of trial, contradicted prior representations it made to the Court, failed to comply with the local rules during discovery, and generally acted like a

knave.  *Id.* at 3–11.  Apple disputes VirnetX's claims, alleging VirnetX greatly exaggerates and misrepresents Apple's behavior.  Docket No. 629 at 1.

Although, Apple failed to always act as professional as this Court expects[12], its "misconduct" did not rise to the level that warrants the award of attorneys' fees.  *Cf. ReedHycalog UK, Ltd. v. Diamond Innovations, Inc.*, No. 6:08-cv-325, 2010 U.S. Dist. LEXIS 83011, *23 (E.D. Tex. Aug. 12, 2010) (finding a case exceptional when the defendant repeatedly acted in bad faith and attempted to conceal "relevant and discoverable but damaging documents"); *z4 Techs., Inc. v. Microsoft Corp.,* No. 6:06-cv-142, 2006 U.S. Dist. LEXIS 58374, *68–76 (E.D. Tex. Aug. 18, 2006)(awarding attorneys' fees when the defendant withheld critical evidence, took intentional steps to mislead the Court on several occasions, and attempted to conceal relevant trial evidence with its voluminous exhibit tactic).  There is little, if any, evidence that Apple intentionally disregarded this Court's orders or explicitly contradicted statements it made to the Court.  Apple was guilty of misconduct when it improperly terminated a deposition, however, Apple has already been sanctioned for this behavior.  *See* Docket No. 450.  As to Apple's other incidents of "egregious" behavior, it does not appear that Apple acted in bad faith.  At best, VirnetX cites to some occasions of rude behavior, but this alone does not support declaring this to be an exceptional case.

Additionally, VirnetX urges the Court to award attorneys' fees because of Apple's size and financial condition, the duration of Apple's misconduct, Apple's failure to take remedial action, and the outcome of the case.  *Id.* at 11–13.  The application of the *Read* factors in the absence of a finding of willful infringement does not support declaring this an exceptional case.  Accordingly, the Court **DENIES** VirnetX's request for attorneys' fees.

---

[12] This Court understands the litigious nature of these proceedings; however, this does not excuse a party from acting with the courtesy and respect one should afford a fellow professional.

*Judgment on Defenses and Counterclaims not Presented at Trial*

VirnetX also requests the Court to enter judgment on all of Apple's invalidity defenses and counterclaims, including Apple's prior art references, which Apple asserted up to the time of trial, but never presented to the jury.  Docket No. 625 at 13.  VirnetX contends judgment should be entered because there was still an actual controversy as to the validity of every claim of the patents-in-suit at the time of trial.

Initially, VirnetX asserted a substantial number of claims, which it narrowed to 77 asserted claims at the time of the pre-trial hearing.  *See* Docket No. 482. Apple itself initially asserted several defenses and counterclaims, including anticipation, obviousness, and failure to comply with the written description requirement, however as VirnetX narrowed its claims so too did Apple narrow its defenses and counterclaims.  VirnetX concedes it only presented 16 claims to the jury, however, it argues it never actually dismissed any of its asserted claims.  *Id.* at 14.[13] Rather, it merely narrowed its case to present to the jury.

In patent cases, "the existence of a case or controversy must be evaluated on a claim-by-claims." *Jervis B. Webb Co. v. So. Sys., Inc.,* 742 F.2d 1388, 1399 (Fed. Cir. 1984). Additionally, the existence of a case or controversy "must exist at all stages of review, not merely at the time the complaint [was] filed." *Streck, Inc. v. Research & Diagnostic Sys.,*665 F.3d 1269, 1282 (Fed. Cir. 2012)(original citations omitted).  Thus, there must be a showing that a "continuing case or controversy with respect to withdrawn or otherwise unasserted claims" still exists.  *Id.* at 1283.

Here, Apple only presented an anticipation defense to the jury, and only with respect to the claims asserted by VirnetX at trial.  Apple presented no other evidence at trial regarding its

---

[13] Only claims 1, 3, 7, 8 of the '135 Patent; claims 1 and 13 of the '151 Patent; claims 1, 2, 5, 16, 21, and 27 of the '504 Patent; and claims 36, 37, 47 and 51 of the '211 Patent were asserted by VirnetX at trial.

other invalidity theories and prior art references.  The Court cannot and will not enter judgment

upon claims and defenses that were not presented for consideration to the jury.  There is no basis

to enter such a judgment, no more than there is a basis to enter judgment of non-infringement for

Apple as to VirnetX's unasserted claims.  *See Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542,

1553 (Fed. Cir. 1983); *Datascope Corp. v. Smec, Inc.,* 776 F.2d 320, 327 (Fed. Cir. 1985)(noting

that references in pleadings do not support a judgment that particular claims are invalid when

"the validity of those claims were not litigated by the parties at trial");  *Nordisk Pharm., Inc. v.

Bio-Technology Gen. Corp.*, 424 F.3d 1347, 1356 (Fed. Cir. 2005) (vacating the district court's

order invalidating a claim not litigated at trial).  The Court encourages and requires the parties to

narrow their case for trial.  Accordingly, the Court will not penalize such attempts to narrow

issues by entering judgment on issues not presented at trial.

   *Conclusion*

   In light of the foregoing, VirnetX's Motion for Entry of Judgment on the Jury Verdict,

Request for Attorneys' Fees, and Judgment against Apple on Apple's Late-Abandoned

Counterclaims and Defenses, including all of Apple's Alleged Prior Art References is

**GRANTED IN PART** and **DENIED IN PART.**  The Court will enter judgment against Apple

only on the claims presented at trial.

## CONCLUSION

   Accordingly, Apple's Motion for Judgment as a Matter of Law under Rule 50(b) or, in

the alternative, for a New Trial or a Remittitur is **DENIED**.  VirnetX's Motion for Post-Verdict

Damages to the Time of Judgment, Pre-Judgment interest, and Post-Judgment Interest is

**GRANTED IN PART** and **DENIED IN PART**.  VirnetX's Amended Motion for Post-Verdict

Damages is **GRANTED.**   VirnetX's Motion for Permanent Injunction is **DENIED**, and

**SEVERS** VirnetX's request for an Ongoing Royalty into a separate action.   Lastly, VirnetX's Motion for Entry of Judgment on the Jury Verdict, Request for Attorneys' Fees, and Judgment against Apple on Apple's Late-Abandoned Counterclaims and Defenses, including all of Apple's Alleged Prior Art References is **GRANTED IN PART** and **DENIED IN PART**.

  **So ORDERED and SIGNED this 26th day of February, 2013.**

  _____
  **LEONARD DAVIS**
  **UNITED STATES DISTRICT JUDGE**